**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GAYLON CLARK, | ) | CASE NO. 1:17CV978 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| LASHANN EPPINGER, Warden | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |

This matter has been referred to the undersigned United States Magistrate Judge for preparation of a Report and Recommendation pursuant to Local Rule 72.2(b)(2). Before the Court is the Petition of Gaylon Clark ("Clark" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Clark is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Clark*, Cuyahoga County Court of Common Pleas Case No. CR-13-573724.

Before the Court is Respondent LaShann Eppinger's Motion to Dismiss the Petition as Time-Barred. (Doc No. 6.) For the reasons that follow, it is recommended Respondent's Motion be GRANTED and the Petition be DISMISSED as time-barred.

**I. Summary of Facts**

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695

F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts underlying Clark's conviction as follows:

> {¶ 2} On August 20, 2013, Clark was indicted pursuant to a 19–count indictment in connection with the alleged sexual abuse of J.W., the daughter of his live-in girlfriend. The state of Ohio ("state") maintained that the offenses occurred in five separate incidents from October 2011 to January 2013.1 After a mistrial in April 2014, the following 15 counts remained in the indictment: two counts of rape, one count of attempted rape, six counts of gross sexual imposition, four counts of kidnapping with sexual motivation specifications, and two counts of sexual battery.
>
> {¶ 3} A second jury trial commenced on June 25, 2014. The state presented testimony from J.W.'s mother ("mother") who stated that J.W. was born in March 1996 and placed in the legal custody of her paternal grandmother when she was three years old. During the weekends and holidays, J.W. would visit at the home her mother shared with her other two children and Clark. Mother stated that Clark treated J.W. as one of his own children. In 2011, the family lived in an apartment in Cleveland. During the weekends, J.W. and the other girls all shared a bedroom. There were bunk beds in the room, so during the visits the girls would share their beds. J.W. generally slept in the bottom bed, which was a larger trundle bed. In 2012, the family moved to Cleveland Heights, and J.W. then had her own bedroom during her weekend visits.
>
> {¶ 4} Mother next testified that after the family moved to Cleveland Heights, J.W. started skipping school and her grades began to fall. J.W. skipped school one day in January 2013, and mother contacted J.W.'s friend, Tyrone, in order to try to find her. Tyrone told mother that Clark had been abusing J.W. Following that discussion, she located J.W. and asked her whether Clark had ever raped her. J.W. started shaking and crying. Mother then spoke with Clark about the allegations. The next day, mother contacted the Cuyahoga County Division of Children and Family Services ("CCDCFS"), which in turn instructed her to call the police. Mother and her girls later moved out of the home.
>
> {¶ 5} On cross-examination, mother admitted that she was initially uncertain as to whether J.W. was simply making up a story to cover for cutting school because she had seen "zero" signs of anything inappropriate.
>
> {¶ 6} J.W., who was 18 years old at the time of the second trial, testified that she has lived with her grandmother since she was very young. She saw her biological father daily and did not see her mother very much until she turned 13 or 14 years old. By this time, her mother was living with Clark. According to J.W., Clark "played the father role" in her life, and she thought of him as a father.

{¶ 7} In October 2011, she was visiting her mother and Clark. It was Halloween weekend, and her mother went to a Halloween party and Clark went to a restaurant. When Clark returned, the younger children were asleep, and mother was still not home. According to J.W.'s testimony, Clark asked her to watch a movie with him. She sat next to him on the couch, and Clark began rubbing her back under her shirt. He caressed her "underneath [her] bra," and fondled her breasts. He knelt down between her knees and removed her shorts and underwear. Clark, who was wearing shorts and a T-shirt, pulled his penis out and penetrated her. J.W. stated that she cried during the incident, but she did not say anything because he was "suppose to be my stepdad." J.W. testified that after this incident, Clark kept apologizing.

{¶ 8} J.W. further testified that approximately one week after the first incident, while the three younger girls were asleep in their beds, Clark came into the room and began to fondle J.W.'s thighs. He fondled her breasts, then pulled down her pants and digitally penetrated her.

{¶ 9} Later, in a separate incident in the bedroom, Clark again came into J.W.'s room. While the other children were sleeping nearby, Clark pulled down J.W.'s pants, then pulled down his pants. As he attempted to penetrate her, one of the children in the other bed began moving, so he left without penetrating her. Shortly after that, J.W. received a private post from Clark on her Facebook account. This message stated:

> I hope you're not upset with me. We're not finish [sic]. I hate doing that in there with them, but I was worried on the couch. I think someone is going out tonight, I won't be as nervous next time. Plus I want to like the first time.

{¶ 10} J.W. next testified that after these incidents the family moved to Cleveland Heights. J.W. stated that in the Cleveland Heights home she did not share a room with her sisters and had her own bedroom. After this move, Clark came into her bedroom during the night. He got on top of her and began to rub her thighs. He attempted to put his hands in her pants, but could not do so because she was on her stomach. She then nudged him to move, and that is when he got up and left her room.

{¶ 11} J.W. also testified to another incident that occurred around December 2012, at night, while the family was driving to Clark's aunt's house in preparation for attending a funeral. According to J.W., Clark's cousin Steve was driving, and her mother was in the front seat. J.W., Clark, and the younger girls were in the backseat. During the drive, Clark stretched his arm over the younger girls and grabbed and fondled her chest underneath her bra. On another occasion, J.W. testified that Clark asked J.W. to watch a movie with him. J.W. stated that she reluctantly agreed to do so. She began to doze off, and when she awoke, Clark was rubbing her lower back.

{¶ 12} After these events, J.W. skipped school and confided in Tyrone that Clark had abused her. Later that day, mother called Tyrone looking for J.W. Mother subsequently informed Clark that J.W. had spent the day with Tyrone, and Clark threatened to call the police. In response, Tyrone told mother that Clark had been abusing J.W. In her initial discussion of the matter with mother, J.W. stated that Clark did not rape her. However, later in the discussion, she stated that he had done so. After that disclosure, J.W. told Nicole Ratti ("Ratti"), a licensed professional clinical counselor with Bellfaire JCB, that she felt overwhelmed, confused, and scared of the outcome. She also met with Cleveland Police Detective Sharon Johnson ("Detective Johnson") and CCDCFS Social Worker Nakita Heard ("Heard").

{¶ 13} The paternal grandmother testified that when J.W. was 14 years old, she wanted to spend more time with her mother and began going to her home every weekend. The paternal grandmother believed that Clark was "too affectionate" with J.W. during these visits.

{¶ 14} The biological father of J.W. testified that he observed that Clark and J.W. had a "touchy-feely relationship," that "looked weird." On cross-examination, he acknowledged that he lived at his mother's home with J.W., and that he was her "father figure."

{¶ 15} Ratti testified that the Cleveland School system referred J.W. for an assessment in January 2013. Ratti began counseling her in February 2013, and determined that J.W. has ADHD. In addition, at the initial counseling session, J.W. stated that she had been raped. They then began to "focus on the trauma" and engaged in trauma-based cognitive behavioral therapy. According to Ratti, they "made general correlations with behaviors[,] such as[,] * * * not wanting to become intimate with a young man that might have been her boyfriend." (Tr. 791.) Ratti made the "correlation" that intimacy avoidance was from the trauma she sustained. (Tr. 791.) Ratti also testified that some individuals may not promptly disclose a traumatic event because of guilt, shame, and fear of not being believed.

{¶ 16} Detective Johnson testified that she conducted an investigation in this matter. She interviewed family members and learned of a private message posted on J.W.'s Facebook account. She subpoenaed the account information from Facebook and preserved the posting, a hard copy of which was admitted into evidence. According to Detective Johnson, the private message was sent to J.W. from Clark's cell phone on February 11, 2012.

{¶ 17} During Detective Johnson's interview with Clark and his counsel, Clark denied the allegations made against him. Clark reportedly told Detective Johnson, however, that he was "more of a father to [J.W.] than her own father." Clark also

4

denied sending the private message to J.W., and he theorized that someone else may have sent it from his cell phone while the phone was left unattended.

{¶ 18} Heard testified that she conducts intake interviews in sex abuse cases. She was assigned to J.W.'s case in February 2013, and it was a "priority 2," or a case that requires contact with the complainant within 24 hours. Heard spoke with J.W. after the family finished meeting with Detective Johnson. According to Heard, J.W. was upset and cried throughout the entire interview. J.W. discussed three separate incidents with Heard. Heard learned that there was no medical evidence in this matter. Ultimately, however, after learning of the Facebook private posting, Heard concluded that the allegations were substantiated, meaning that there is "some form of evidence that can corroborate what the victim is telling us." This is a completely different standard than evidence beyond a reasonable doubt, she acknowledged. Heard additionally testified that typically there is a delay in reporting following an alleged incident of abuse, and that such allegations often involve "ongoing" or recurring incidents of abuse. (Tr. 856 .) Heard admitted, however, that there is "always room for mistakes" in what she does.

{¶ 19} Clark elected to present evidence and testified on his own behalf. He also presented testimony from Reverend Able Dixon and Steve Doatie ("Doatie").

{¶ 20} Clark testified that after graduating from high school, he attended the University of Cincinnati for one year. He has worked steadily since that time, and he is currently an IT business specialist with Forest City Enterprises.

{¶ 21} Clark testified that he met J.W.'s mother in 2006. They have been together since that time, and lived together except for brief break-ups in 2010 and 2012. Clark testified that he did not abuse J.W., and that none of her allegations are true. With regard to the Facebook post entered into evidence in this matter, Clark testified that he did not send this message, and he had no explanation for how it came to be posted on J.W.'s Facebook account.

{¶ 22} Doatie testified that he is Clark's cousin. He was adamant that he has never driven Clark and the girls together at any time, and that J.W. has never been in his car. He admitted, however, that Clark does not have a car and had to be driven to various family events.

{¶ 23} Clark was subsequently convicted of two counts of rape, in violation of R.C. 2907.02(A)(2); four counts of gross sexual imposition, in violation of R.C. 2907.05(A)(1); four counts of kidnapping, in violation of R.C. 2905.01(A)(4), with sexual motivation specifications; one count of attempted rape, in violation of R.C. 2923.02 and 2907.02; one count of sexual battery, in violation of R.C. 2907.03; and one count of attempted sexual battery, in violation of R.C. 2923.02 and 2907.03(A)(5). He was acquitted of two charges of gross sexual imposition, one

charge arising from the events that were alleged to have occurred during the car drive, and the other charge arising in connection with the events that were alleged to have occurred after the family moved to Cleveland Heights. He was sentenced to a total of eight years of imprisonment.

*State v. Clark*, 2015 Ohio 3027 at *1-4 (Ohio App. 8th Dist. July 30, 2015).

## II. Procedural History

### A. Trial Court Proceedings

On August 20, 2013, a Cuyahoga County Grand Jury indicted Clark on the following nineteen counts: three counts of rape in violation of Ohio Rev. Code § 2907.02(A)(2) (Counts 1, 4, and 9); seven counts of gross sexual imposition in violation of Ohio Rev. Code § 2907.05(A)(1) (Counts 2, 6, 7, 11, 15, 17, and 18); five counts of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(4) with sexual motivation specifications (Counts 3, 8, 12, 16, and 19); two counts of sexual battery in violation of Ohio Rev. Code § 2907.03(A)(5) (Counts 5 and 10); one count of attempted rape in violation of Ohio Rev. Code § 2923.02/2907.02(A)(2) (Count 13); and one count of attempted sexual battery in violation of Ohio Rev. Code § 2923.02/2907.03(A)(5) (Count 14). (Doc. No. 6-1, Exh. 1.) Clark entered a plea of not guilty. (Doc. No. 6-1, Exh. 2.)

The case proceeded to jury trial on March 26, 2014. (Doc. No. 6-1, Exh. 13.) On March 28, 2014, Clark moved for acquittal under Ohio Crim. R. 29 as to all charges. (*Id.*) The trial court granted Clark's motion in part, as to Counts 13 (attempted rape), 14 (attempted sexual battery), 18 (gross sexual imposition) and 19 (kidnapping). (*Id.*) After three days of deliberation, the jury reported it was unable to reach a unanimous verdict. (*Id.*) The trial court declared a mistrial. (*Id.*)

6

On June 25, 2014, the case proceeded to a second jury trial.  (*Id.*)  On June 30, 2014, the State moved to amend Counts 9 (rape) and 10 (sexual battery) to reflect the lesser included offenses of attempted rape and attempted gross sexual imposition, respectively.  (*Id.*)  On July 1, 2014, the jury returned verdicts of (1) guilty of rape as charged in Counts 1 and 4; (2) guilty of gross sexual imposition as charged in Counts 2, 6, 7, and 11; (3) guilty of kidnapping with sexual motivation specifications as charged in Counts 3, 8, 12, and 16; (4) guilty of sexual battery as charged in Count 5; (5) guilty of attempted rape as charged in Count 9; (6) guilty of attempted sexual battery as charged in Count 10; and (7) not guilty of gross sexual imposition as charged in Counts 15 and 17.  (Doc. No. 6-1, Exh. 4.)

Clark was thereafter sentenced on August 1, 2014 as follows:

> The Court imposes a prison sentence at the Lorain Correctional Institution of 8 years.  The Court finds that certain of the charged offenses are allied offenses of similar import and sentences Defendant as follows:
>
> Count 3 merges into Count 1; State elects to proceed to sentence on Count 1; Court imposes a prison sentence of 8 years on Count 1.
>
> Court imposes a sentence of 18 months on Count 2.
>
> Courts 5, 6, and 8 merge into Count 4; State elects to proceed to sentence on Count 4; Court imposes a sentence of 8 years on Count 4.
>
> Court imposes a sentence of 18 months on Count 7.
>
> Counts 10 and 12 merge into Count 9; State elects to proceed to sentence on Count 12; Court imposes a sentence of 8 years on Count 12.
>
> Court imposes a sentence of 18 months on Count 11.
>
> Court imposes a sentence of 8 years on Count 16.
>
> Sentences to run concurrent to each other for a total of 8 years.

7

(Doc. No. 6-1, Exh. 5.) The trial court also imposed five years of post release control and found Clark was both a Tier I and Tier III sex offender. (*Id*.)

**B.     Direct Appeal**

On August 31, 2014, Clark, through counsel, filed a notice of appeal to the Eighth District Court of Appeals of Ohio ("state appellate court"). (Doc. No. 6-1, Exh. 6.) In his appellate brief, Clark raised the following four assignments of error:

> I.      The trial court erred by denying Appellant's motion for acquittal pursuant to Crim. R. 29 when the State failed to submit sufficient evidence for the essential elements of the crimes charged denying the Appellant of due process.
>
> II.     Appellant's convictions are against the manifest weight of the evidence.
>
> III.    The Appellant was denied a fair trial by the admission of expert opinions in areas in which the witness was not qualified as an expert nor permitted by law to testify and which amounted to credibility testimony.
>
> IV.     The trial court committed prejudicial error and/or plain error in violation of the Double Jeopardy clause of the United States Constitution and Section 10, Article I of the Ohio Constitution when it failed to merge the sentences for crimes committed at the same time with the same animus.

(Doc. No. 6-1, Exh. 7.) The State filed a brief in response. (Doc. No. 6-1, Exh. 8.)

On July 30, 2015, the state appellate court affirmed Clark's convictions and sentences. (Doc. No. 6-1, Exh. 9.) *See also State v. Clark*, 2015 Ohio 3027 (Ohio App. 8th Dist. July 30, 2015).

The record reflects Clark filed an untimely notice of appeal and motion for delayed appeal in the Supreme Court of Ohio on March 2, 2016. (Doc. No. 6-1, Exhs. 10, 11.) In his motion, Clark stated as follows:

> On July 30th 2015, the court of Appeals filed it's decision and Opinion in my case, I have attached a copy of the Court of Appeals opinion to this motion. I was unable to file a Notice of Appeal, Memorandum in Support of Jurisdiction within the 45 days of the Court of Appeals decision in my case for the following reasons:
>
> I submitted my initial notice of appeal to this court in a timely fashion. Because I had sent my motion and opinion in two separate packages (marked 1 of 2 and 2 of 2) they were processed as incomplete and sent back to me separately. I re-packaged and sent them together, explaining the error and expressing that both packages were (in fact) timely. I was then advised to file under a delayed appeal.
>
> I have been trying to figure out the rules and find my way through this process. I have attached the time stamped copies of my past submission and proof of my due diligence. If not for this error, my initial filing would have been timely submitted. Lastly, due to my indigency, I have had to wait in order to save for more copies and postage.
>
> In conclusion, I pray that this court grants me leave to file my Delayed Appeal and a Notice of Appeal.

(Doc. No. 6-1, Exh. 11.) In attachments to his Motion, Clark indicated his first package containing his "initial notice of appeal was time-stamp September 14, 2015" and his second package containing the "Journal and Opinion . . . was time-stamped for the eighteenth."[1] (Doc. No. 6-1, Exh. 11 at Page ID # 106.) He claimed the prison erred in processing his mail and "failed to deliver its return in a timely manner." (*Id.*)

On May 4, 2016, the Supreme Court of Ohio denied Clark's motion for delayed appeal. (Doc. No. 6-1, Exh. 12.)

---

[1] The docket for Clark's Ohio Supreme Court case does not reflect any filings prior to his March 2, 2016 notice of appeal and motion for delayed appeal. (Doc. No. 6-1, Exh. 15.)

**C.      Post-Conviction Motion**

Meanwhile, on March 6, 2015, Clark filed a *pro se* "Motion to Vacate Court Cost or Set Aside" in the state trial court. (Doc. No. 6-1, Exh. 13.) The court granted Clark's motion in part on March 17, 2015. (*Id.*)

**D.      Federal Habeas Petition**

On April 30, 2017, Clark filed a *pro se* Petition for Writ of Habeas Corpus and asserted the following grounds for relief:[2]

> **GROUND ONE**: The trial court erred by denying appellant's motion for acquittal pursuant to Crim. R. 29 when the state failed to submit sufficient evidence for essential elements of the crimes charged denying the appellant of due process.
>
> **Supporting Facts**: As it relates to the facts in the case and surrounding circumstances the court erroneously applied a lesser standard of force which was not warrented [sic] as she was not of tender age. However, despite the lower standard, the petitioner further argues that the state still failed to present sufficient evidence that the petitioner overcame will and thus exercised force or any restraint of liberty as defined in the jury instructions.
>
> **GROUND TWO**: Appellant's convictions are against the manifest weight of the evidence.
>
> **Supporting Facts**: The evidence presented by the state failed to establish beyond a reasonable doubt that the petitioner was guilty of any of the crimes charged based on the facts submitted and the credibility of the witnesses.
>
> **GROUND THREE**: The appellant was denied a fair trial by the admission of expert witness in areas in which the witness was not qualified as an expert nor permitted by law to testify and which amounted to credibility testimony.
>
> **Supporting Facts**: The prosecution witness Nicole Ratti, a school based therapist and licensed clinical counselor should not have been permitted to testify regarding

---

[2] Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison authorities. *See Houston v. Lack*, 487 U.S. 266 (1988). While the Petition herein did not arrive at the Court for filing until May 8, 2017, Clark states he placed it in the prison mailing system on April 30, 2017. (Doc. No. 1 at 15.) Thus, the Court will consider the Petition as filed on April 30, 2017.

10

> J.W.'s disclosure to her and should not have been permitted to testify as to any subsequent trauma behavior Ms. Ratti believed J.W. experienced as a result. The trial court erred by allowing the testimony of CCDFS social worker Nakita Heard, who stated in her opinion, late disclosure occured [sic] in 500 of her cases and were more common than initial disclosure and that sexual assaults occur the majority of the time when other family members were around. Neither witness should have been allowed to testify in this manner as such testimony amounted to no more than the witnesses [sic] judgment of credibility of the complaining witness, which was improper.
>
> **GROUND FOUR**: The trial court committed prejudicial error and/or plain error in violation of the double jeopardy clause of the United States Constitution and Section 10, Article I of the Ohio Constitution when it failed to merge the sentences for crimes committed at the same time with the same animus.
>
> **Supporting Facts**: Trial court erred when it failed to merge counts one (Rape) and two (Gross Sexual Imposition); counts four (Rape) and seven (Gross Sexual Imposition) counts nine (Rape) and eleven (Gross Sexual Imposition) and twelve (Kidnapping). All the requested counts occurred on the same date and during the same encounters with no separation in time or location.

(Doc. No. 1.)

Respondent filed a Motion to Dismiss the Petition as Time-Barred on September 14, 2017. (Doc. No. 6.) Clark did not file a response.

### III. Law and Argument

**A.    Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides a one-year limitations period in a habeas action brought by a person in custody pursuant to the judgment of a State court. Under 28 U.S.C. § 2244(d)(1), the limitation period runs from the latest of--

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

11

>(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
>(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
>(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

**B.     One-Year Limitation**

Pursuant to § 2244(d)(1)(A), the AEDPA's one year period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  Here, Clark was sentenced on August 1, 2014 and timely appealed to the state appellate court on August 31, 2014. (Doc. No. 6-1, Exhs. 5, 6.)  The state appellate court affirmed his conviction and sentence in a decision that was journalized on July 30, 2015.  (Doc. No. 6-1, Exh. 9.)  Clark then had forty-five (45) days to appeal to the Supreme Court of Ohio, but failed to perfect a timely appeal.  Based on this sequence of events, Respondent argues Clark's conviction and sentence became "final" for purposes of § 2244(d)(1)(A) on September 13, 2015, forty five (45) days after the state appellate court released its decision affirming his conviction and the time to file a timely notice of appeal with the Supreme Court of Ohio expired.  (Doc. No. 6 at 11.)  Respondent then asserts the limitations period commenced on September 14, 2015 and, absent tolling, would have expired one year later on September 14, 2016.  *Id.*

Clark did not respond to Respondent's motion and, therefore, does not challenge Respondent's assertion that § 2244(d)(1)(A) is the applicable provision or that his Petition is

12

untimely thereunder. Thus, the Court finds Clark's conviction and sentence became "final" for purposes of § 2244(d)(1)(A) on September 13, 2015, forty five (45) days after the state appellate court issued its decision affirming his conviction and the time to file a timely notice of appeal with the Supreme Court of Ohio expired. Accordingly, the Court finds the limitations period commenced on September 14, 2015 and, absent tolling, expired one year later on September 14, 2016. *Id.*

However, as Respondent correctly notes, the AEDPA tolls the one-year limitations period during the time "'a properly filed application for State postconviction or other collateral review . . . is pending.' § 2244(d)(2)." *Evans v. Chavis*, 546 U.S. 189, 191, 126 S.Ct. 846, 163 L.Ed.2d 684 (2006); *Carey v. Saffold*, 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002); *accord Matthews v. Abramajtys*, 319 F.3d 780, 787 (6th Cir. 2003). "The time that an application for state post-conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law." *Id*.

Only "properly filed" applications for post-conviction relief or collateral review toll the statute of limitations, and "a state post-conviction petition rejected by the state court as untimely is not 'properly filed' within the meaning of § 2244(d)(2)." *Allen v. Siebert*, 552 U.S. 3, 128 S. Ct. 2, 169 L.Ed.2d 329 (2007); *Pace v. DiGuglielmo*, 544 U.S. 408, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("time limits, no matter their form, are 'filing' conditions, and a state postconviction petition is therefore not 'properly filed' if it was rejected by the state court as untimely"); *Monroe v. Jackson*, 2009 WL 73905 at *2 (S.D. Ohio Jan. 8, 2009). A timely filed state post-conviction matter, however, cannot serve to toll a statute of limitations which has

13

already expired before the motion was filed. *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003). Section 2244(d)(2)'s tolling provision "does not ... 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." *Vroman*, 346 F.3d at 602 (citation omitted). Further, if a state court ultimately denies a petition as untimely, that petition was neither properly filed nor pending and a petitioner would not be entitled to statutory tolling. *See Monroe* at *2; *Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007).

Here, Clark filed his *pro se* Notice of Appeal and Motion for Delayed Appeal on March 2, 2016.[3] (Doc. No. 6-1, Exhs 10, 11.) Thus, the limitations period began to run on September 14, 2015 (i.e., the day after Clark's conviction became final on September 13, 2015) and ran continuously for 171 days until he filed his Motion for Delayed Appeal on March 2, 2016.[4] The statute was tolled until the Supreme Court of Ohio denied Clark's motion on May 4, 2016, and

---

[3] As set forth *supra*, Clark states he mailed several documents to the Supreme Court of Ohio in September 2015, October 2015, and January 2016, in an attempt to perfect an appeal from the state appellate court's decision on direct appeal. (Doc. No. 6-1, Exh. 11.) However, as Clark himself acknowledges in his motion for delayed appeal, all of these documents were returned by the Supreme Court of Ohio as incomplete and/or improper. As these documents were not "properly filed," they did not statutorily toll the running of the statute of limitations.

[4] While the filing of a motion for delayed appeal may have a tolling effect during the time the motion remains pending, an unsuccessful motion for delayed appeal does not restart the statute of limitations. *See Searcy v. Carter*, 246 F.3d 515, 519 (6th Cir. 2001) ("although the filing of the motion for delayed appeal may have tolled the running of the one-year statute, it did not cause the statute to begin running anew when the state court denied the motion"); *Anderson v. Brunsman*, 562 Fed. Appx. 426, 429-430 (6th Cir. April 10, 2014); *Backie v. Moore*, 2015 WL 2137164 at * 7 (N.D. Ohio May 7, 2015); *Sands v. Bunting*, 2015 WL 6658725 at * 6 (N.D. Ohio Oct. 30, 2015) (citing cases).

began to run again on May 5, 2016.[5] (Doc. No. 6-1, Exh. 12.) The limitations period then ran uninterrupted for 194 days until it expired on November 15, 2016.

As the statutory limitations period expired on November 15, 2016 and Clark did not file his habeas petition until April 30, 2017, the Court finds the Petition is over five months late and is untimely under § 2244(d)(1)(A). Therefore, unless equitable tolling is appropriate, Clark's Petition should be dismissed as time-barred.[6]

**C.      Equitable Tolling**

Although the Petition herein is untimely, the AEDPA statute of limitations period is also subject to equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 2560, 177 L.Ed.2d 130 (2010). Equitable tolling "allows courts to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010). *See also Hall v. Warden, Lebanon Correctional Institution*, 662 F.3d 745, 749 (6th Cir. 2011). However, the equitable tolling doctrine is granted by courts only "sparingly." *See Robertson*, 624 F.3d at 784. Moreover, "although 'the party asserting statute of limitations as an

---

[5] The ninety day period for seeking certiorari to the United States Supreme Court after the denial of Clark's motion for delayed appeal does not toll the AEDPA's statute of limitations under § 2244(d)(2). *See Lawrence v. Florida*, 549 U.S. 327, 333–34, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (holding that §2244(d)(2) does not toll the one year limitations period during the pendency of a petition for certiorari); *Anderson*, 562 Fed. Appx. at 430 (stating that "the ninety-day period applicable to petitions for certiorari to the United States Supreme Court does not enter the calculation in this scenario, for the reason that the motion for delayed appeal was not a part of the direct review"); *see also Foster v. Bobby*, 2010 WL 1524484, at *2–4 (N.D. Ohio Apr.15, 2010); *Lee v. Warden, Chillicothe Corr. Inst*., 2009 WL 1911917, at*1 (S.D. Ohio June 30, 2009); *Kimble v. Gansheimer*, 2009 WL 4676959 at fn 2 (N.D. Ohio Dec. 4, 2009).

[6] Clark does not argue the limitations period should commence at a later date for any of the reasons set forth in §§ 2244(d)(1)(B)-(D).

15

affirmative defense has the burden of demonstrating that the statute has run,' the petitioner bears the ultimate burden of persuading the court that he or she is entitled to equitable tolling." *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir.2011)(quoting *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002)).

In order to be entitled to equitable tolling, a habeas petitioner must establish that (1) he has been pursuing his rights diligently; and, (2) some extraordinary circumstance stood in his way and prevented timely filing. *Holland,* 130 S.Ct. at 2565. *See also Hall*, 662 F.3d at 749; *Griffin*, 308 F.3d at 653. "The diligence required for equitable tolling purposes is reasonable diligence, not maximum diligence." *Holland*, 130 S.Ct. at 2565. That being said, the Sixth Circuit has held that excessive delays in filing lack appropriate diligence. *See e.g. Keeling v. Warden*, 673 F.3d 452, 463–64 (6th Cir. 2012); *Vroman*, 346 F.3d at 605 (stating that a court should be "much less forgiving ... where the claimant failed to exercise due diligence in preserving his legal rights"); *Henson v. Warden, London Correctional Inst*., 620 Fed. Appx. 417, 419 (6th Cir. 2015).

Respondent argues Clark is not entitled to equitable tolling because "he was simply not diligent in the pursuit of his claims in either the state courts or before this federal habeas Court." (Doc. No. 6 at 13.) Respondent acknowledges Clark's attempts to timely perfect an appeal to the Supreme Court of Ohio, but asserts "a review of [Clark's] pleadings reveals several 'Received' stamps by the Ohio Supreme Court, [but] the earliest 'Received' stamp appears to be the September 18, 2015 stamp on a copy of his appellate court decision, which is still after the 45 day time period" to appeal had expired. (*Id.*) Thus, Respondent argues Clark did not timely file "any portion of the required papers to perfect his appeal to Ohio's highest court." (*Id.*)

16

Further, Respondent asserts "Clark is utterly silent as to why he failed to file his instant federal petition on time." (*Id*. at 14.)

Clark did not file a response to Respondent's motion and offers no argument he is entitled to equitable tolling herein.

Even if Clark had raised the issue of equitable tolling, the Court would have serious doubts as to whether he exercised sufficient diligence under the circumstances. As noted above, while Clark claims his "initial," incomplete notice of appeal to the Supreme Court of Ohio was timely, the documents attached to his Motion for Delayed Appeal reflect the earliest document stamped "Received" by that court is dated September 18, 2015, five days after the September 13, 2015 filing deadline. (Doc. No. 6-1, Exh. 11 at Page ID#108.) Moreover, Clark does not sufficiently explain why it then took another five months (until March 2, 2016) to properly file his Motion for Delayed Appeal.

In that Motion, Clark suggests the difficulty he experienced perfecting his appeal was due to his *pro se* status and lack of legal training. (Doc. No. 6-1, Exh. 11 at Page ID#104) ("I have been trying to figure out the rules and find my way through this process.") The Court rejects any suggestion Clark's *pro se* status and/or ignorance of the law constitute "extraordinary circumstances" warranting equitable tolling. The Sixth Circuit has repeatedly held that "ignorance of the law alone is not sufficient to warrant equitable tolling." *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991). *See Allen v. Yukins*, 366 F.3d 396, 403 (6th Cir. 2004); *Allen v. Bell*, 250 Fed. Appx. 713, 716 (6th Cir. 2007); *Taylor v. Palmer*, 623 Fed. Appx. 783, 789 (6th Cir. 2015). *See also Johnson v. United States*, 544 U.S. 295, 311, 125 S.Ct. 1571, 161 L.Ed.2d 542 (2005) ("[w]e have never accepted *pro se* representation alone or procedural

ignorance as an excuse for prolonged inattention when a statute's clear policy calls for promptness"); *Patrick v. Bunting*, 2015 WL 10488878 at * 9 (N.D. Ohio Dec. 29, 2015). Moreover, courts within this Circuit have found a petitioner's *pro se* status, lack of legal training, poor education, and/or limited law-library access, standing alone, are similarly insufficient. *See e.g., Hall*, 662 F.3d at 751 (petitioner's *pro se* status, limited law-library access and lack of access to trial transcript were not sufficient to warrant equitable tolling); *Keeling*, 673 F.3d at 464 ("Keeling's *pro se* status and lack of knowledge of the law are not sufficient to constitute an extraordinary circumstance and to excuse his late filing"); *Burden v. Bunting*, 2016 WL 5417834 at * 6 (N.D. Ohio July 15, 2016) ("Courts have uniformly held that neither a prisoner's *pro se* status nor his lack of knowledge of the law constitute extraordinary circumstances justifying equitable tolling"); *Johnson v. LaRose*, 2016 WL 5462635 at * 10 (N.D. Ohio July 8, 2016) ("A petitioner's *pro se* status and his unawareness of the law provide no basis for equitable tolling"). Accordingly, and under the circumstances presented, the Court finds Clark has failed to demonstrate his *pro se* status and/or lack of legal training constitute extraordinary circumstances justifying equitable tolling.

In sum, because Clark failed to exercise his rights diligently and no extraordinary circumstance prevented him from filing the instant Petition, the Court finds equitable tolling is not warranted in this case.

**E.     Actual Innocence**

In *McQuiggin v. Perkins*, 569 U.S. 383, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013), the United States Supreme Court held that actual innocence, if proven, may overcome the expiration of AEDPA's one-year statute of limitations. The Court noted that a claim of actual

18

innocence is not a request for equitable tolling but, rather, a request for an equitable exception to § 2244(d)(1).  *Id*. at 1931.

For the actual innocence exception to apply, a petitioner must "support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  The Supreme Court explained, however, that "tenable actual-innocence gateway pleas are rare" and "'[a] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *McQuiggin*, 133 S.Ct. at 1928 (quoting *Schlup*, 513 U.S. at 329).  In making this assessment, "'the timing of the [petition]' is a factor bearing on the 'reliability of th[e] evidence' purporting to show actual innocence."  *Id*. (quoting *Schlup*, 513 U.S. at 332).

Here, Clark does not argue he is entitled to the actual innocence exception nor does he identify any new, reliable evidence of his actual innocence that was not presented at trial.  The Court therefore finds Clark has not demonstrated he is entitled to the actual innocence exception.[7]

---

[7] As Respondent correctly notes (Doc. No. 6 at fn 5), even if the instant Petition were not time-barred, each of Clark's four grounds for relief would be procedurally defaulted as he failed to perfect a timely appeal to the Supreme Court of Ohio on direct appeal and that court denied his Motion for Delayed Appeal.  *See Bonilla v. Hurley*, 370 F.3d 494 (6th Cir. 2004).  Moreover, Clark does not argue cause, prejudice, or actual innocence to excuse the default.

19

## IV. Conclusion

For the foregoing reasons, it is recommended the Court find the instant Petition is time-barred under § 2244(d)(1). It is further recommended Respondent's Motion to Dismiss (Doc. No. 6) be GRANTED and the Petition be DISMISSED.

                         *s/ Jonathan D. Greenberg*
                         Jonathan D. Greenberg
                         United States Magistrate Judge

Date: April 23, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981);** *Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**